Opinion by
 

 Keller, P. J.,
 

 Three true bills were returned in Susquehanna County to January Sessions, 1941, charging that the appellant, Daniel Mezick, and John Buchla, John Mezick and John Oshmankewicz had jointly conspired to cheat and defraud the Carolina, Fire Insurance Company (No. 6), the Homestead Insurance Company (No. 7) and the Home Underwriters Fire Insurance Company (No. 8). The bills were drawn under section 302 of the Criminal Code of June 24, 1939, P. L. 872.
 

 By consent of all parties, the three bills were consolidated and tried as one, resulting in a verdict of guilty as to all four defendants. A motion in arrest of judgment was refused. Buies for new trial were discharged as to all but John Oshmankewicz, and a new trial was granted him. Sentence was imposed on the other three defendants. Daniel Mezick appealed.
 

 The statement of questions involved, which limits the scope of our review on appeal, presents three subjects for our consideration, in addition to the “stock” refusals of a new trial and arrest of judgment, viz.:
 

 
 *413
 
 1— The jurisdiction of the court.
 

 2— The sufficiency of the evidence to establish an unlawful confederation.
 

 3— Alleged errors in rulings on evidence and the charge of the court. '
 

 (1) The appellant contends that the Court of Quarter Sessions of Susquehanna County had no jurisdiction because there was no proof of any unlawful combination or confederation within that county, all the defendants being residents of Lackawanna County or Luzerne County. But it is well settled that prosecution for criminal conspiracy may be brought in the county where the unlawful combination or confederation was formed,
 
 or
 
 in any county where an overt act was committed by any of the conspirators in furtherance of that unlawful combination or confederacy:
 
 Com. v. Spencer,
 
 6 Pa. Superior Ct. 256, 268-9;
 
 Com. v. Barnes,
 
 107 Pa. Superior Ct. 46, 59, 162 A. 670;
 
 Com. v. Bartilson,
 
 85 Pa. 482, 489. An
 
 overt
 
 act is distinguished from that which rests merely in
 
 intention
 
 or design; and as used in the law of conspiracy it means an act done in furtherance of the object of the conspiracy. In this Commonwealth, the common law rule prevails. No overt act need be set forth in the indictment :
 
 [1]
 

 Com. v. McKisson,
 
 8 S. & R. 420 (Gibson, J.); and none need be
 
 proved
 
 to sustain a conviction for conspiracy:
 
 Com. v. Richardson,
 
 229 Pa. 609, 611, 79 A. 222, affirming 42 Pa. Superior Ct. 337, 342, (Rice, P. J.). When proved, such acts are admitted as evidence of the unlawful combination and the criminal intent. The unlawful confederacy is the gist of the offense:
 
 Com. v. Brown,
 
 23 Pa. Superior Ct. 470, 490 (Rice, P. J.) ;
 
 Collins v. Com.,
 
 3 S. & R. 220, 226-7 (Duncan, J.);
 
 Hyde v. United States,
 
 225 U. S. 347, 365-6. The residence of the conspirators is unimportant:
 
 Com. v. Gillespie,
 
 7 S. & R. 469, 477 (Duncan, J.).
 
 *414
 
 They may be prosecuted wherever any act is done by any of them in furthering or carrying out the unlawful confederation. In the present case the alleged criminal conspiracy was a combination or confederation to cheat and defraud three fire insurance companies by greatly over-insuring a building and its contents so that in case of a fire causing their destruction, they would be unlawfully enriched at the expense of the insurers. The building and contents insured were located in Susquehanna County. Acts were done in that county by some of the conspirators — for which all of them were chargeable:
 
 Com. v. Strantz,
 
 328 Pa. 33, 40, 195 A. 75, 79;
 
 Com. v. Rhey,
 
 140 Pa. Superior Ct. 340, 351, 14 A. 2d 192 — which tended to bring about the fruition or consummation of the unlawful combination. Therefore a prosecution might be brought in Susquehanna County.
 

 (2) At the conclusion of the Commonwealth’s case, the defendants demurred to the evidence. See Act of June 5, 1937, P. L. 1703. The court overruled the demurrer and the defendants produced evidence in their behalf, although they themselves did not take the witness stand and testify. This overruling of the demurrer is now assigned for error (8th assignment), and raises the question of the sufficiency of the evidence to convict. The disposition of it will require some reference to the evidence in the record. As the jury found the defendants guilty, all conflicts in the evidence must be resolved against them and all inferences of fact favorable to the Commonwealth be drawn.
 

 The defendant, Daniel Meziek, was a local insurance agent of the three above-named fire insurance companies, with authority to write, countersign and issue policies on their behalf.. He interested John Buchla, a neighbor of his, who ran a saloon and also held a position at the Blakely Poor Farm, in the purchase of an unoccupied property in Dundaff, Clifford Township, Susquehanna County, owned by Howard S. Okie, a lawyer in Philadelphia. They drove to the property,
 
 *415
 
 looked at the house from the outside, called on the nearest neighbor, a Mrs. Shaw, who was a cousin of Okie’s, and learned from her who owned the property and his approximate asking price for it. They had gone back to look at the house on two occasions, and then, accompanied by John Mezick, they drove to Philadelphia, where Buchla and John Mezick called on Okie to learn about the property and what it could be bought for, while Daniel Mezick, apparently, attended to some business of his own. This was on May 27, 1940. They learned that there was a $500 mortgage on the property and that it could be bought for $450 or $500 cash, subject to the mortgage.
 
 Daniel Mezick
 
 employed a lawyer to negotiate for the property and Okie finally agreed to sell the property for $900, that is, $400 above the mortgage, and an agreement of sale to Buchla on those terms was signed on June 15, 1940; $100 was paid down, the balance to be paid on delivery of the deed. Okie and his wife signed and acknowledged the deed on July 23,1940, but the balance of the purchase price was not paid until September 9, 1940, when the deed was delivered and possession given. The check for the remainder of the purchase money was delivered to the lawyer by Daniel Mezick, so he was fully conversant with the amount paid for the property. In the meantime, as agent for the before mentioned insurance companies, Daniel Mezick issued the following policies of fire insurance on the property. On June 17, 1940, a policy for $3,000 covering the dwelling, in the Carolina Insurance Company. On the same day a policy in the Homestead Insurance Company for $3,000 — $1,500 on the dwelling, and $1,500 on the furniture and contents. And on August 23, 1940 a policy in the Home Underwriters Fire Insurance Company on a
 
 one-story
 
 asphalt-roof frame building — “occupancy given as a dwelling house,” but known as the summer kitchen — separated from the main dwelling, for $800; thus making the insurance on the dwelling and summer kitchen $5,300,
 
 *416
 
 (the prior insurance on the house was $1,750), and on the “contents” of the unoccupied and unfurnished buildings, $1,500. While a purchaser of real estate has a right to insure buildings on the real estate which he has contracted to buy by agreement of sale, if his interest is so described, — in this case it was not so described — there could be no possible right in him to insure contents not in the buildings. Daniel Mezick knew that there was no furniture or household equipment then in the house. There was no testimony in the case that Buchla had ordered Daniel Mezick to take out the insurance or that he paid for it.
 

 Sometime after the agreement of sale was entered into these three defendants went to the house and took charge of it. Daniel Mezick ‘bossed,’ that is attended to, the care and upkeep of the place. Fred Bought, a man in the employ of John Mezick, was sent there by Daniel Mezick to cut the grass and look after the place, for which he promised to pay him $2 a day; and following him, the other defendant, John Oshmankewiez, was sent by Daniel Mezick to Buchla to get the job of caretaker, and he spent five or six days of each week there, for about five weeks, until the house was destroyed by fire on Saturday, September 21, 1940, twelve days after the delivery of the deed. Oshmankewiez was usually brought to or from the place by John Mezick or Daniel Mezick and they also supplied him with food, and he was paid $5 a week by Buchla. At first the house was bare of contents, but later Buchla brought some furniture in a truck,
 
 by night,
 
 consisting of a kitchen oil stove, an old metal ice box, a three piece living room set, consisting of a sofa and two chairs, and a few kitchen utensils — a plate, cup and saucer, a knife, fork and spoon. The caretaker slept on the sofa in the living room. The upper rooms of the house were locked, but there was nothing in them when Bought left and nothing was put in them while Oshmankewiez was there. He had a key with which he locked the dwelling when he
 
 *417
 
 left on Saturdays and it remained so until lie returned on Mondays.
 

 Oshmankewicz told the officers that on Saturday, September 21,1940, he left the place shortly after lunch and walked to Jessup where Buchla and Daniel Mezick lived. No one saw him leaving.
 
 [2]
 
 When he left, he said, no fire was in the house. The place was not wired for electricity. He cooked with kerosene which Buchla had brought there in a can. A heavy thunderstorm, accompanied by sharp lightning, began about one o’clock and lasted about three-quarters of an hour. About an hour after the storm was over, G-lenn Wells went by the house and saw no sign of smoke or fire there. Around three o’clock black smoke was seen coming out of the house. A neighbor, Edward Franceschi, saw it and went to the house and, finding the doors, locked, kicked in the front door, found the house on fire and burning so fiercely that it was soon totally destroyed, leaving nothing but cinders and ashes. There was no fire-fighting equipment in the neighborhood. Franceschi saw no signs or marks that the house had been struck by a bolt of lightning. Word of the fire reached Buchla and Daniel Mezick shortly. Buchla would do nothing about it until he consulted Dan Mezick, and the latter, although the agent of the insurance companies, employed a public adjuster to represent Buchla in the preparation and presentation of his claims for insurance. The adjuster received false information from Buchla as to the replacement cost of the house and as to the contents in it at the time of the fire, and from the information received from him and his wife, prepared proofs of loss much in excess of the actual loss on the buildings and
 
 *418
 
 contents, which proofs were forwarded to the companies. Daniel Mezick collaborated in their preparation. Buchla finally admitted to the officers that there were no goods in the house except the few articles detailed by Oshmankewicz, but at first, he had asserted that the house was completely furnished and contained all the articles he had made claim for, rugs, beds, and bedding, furniture, dishes, etc. He told them at first that he and his wife had lived there for two weeks and over week-ends, and then admitted that he had never lived in it and that it was unfurnished except as Oshmankewicz had told them. He made claim for an
 
 electric refrigerator
 
 instead of the old metal ice box that was really there. The summer kitchen, which was insured for $800, could have been replaced for less than $200.
 

 It must be remembered that Daniel Mezick wrote the policies and described the subjects of insurance. He knew the one-story detached building was a summer kitchen, and so endorsed it on the outside of the policy, but in the body of the policy he described it as a one-story, asphalt-roof frame building, occupied as a dwelling house. The endorsement on the policy would not go to the home office, only the description in the body of the policy.
 

 Without going into further details of the falsity of the proofs of loss, we are of opinion that there was ample evidence in the case to show an unlawful combination on the part of Buchla and Daniel Mezick,
 
 [3]
 
 to cheat and defraud the three insurance companies in the procurement and issuance of the policies overvaluing the subjects of insurance, and the presentation of fraudulent and exaggerated claims against the companies for reimbursement for loss by fire under them.
 

 
 *419
 
 The indictments did not charge that the conspirators had burned the buildings to secure the insurance, which greatly exceeded the actual value of the buildings and contents. It did not have to. Whether the buildings were
 
 feloniously
 
 or
 
 accidentally
 
 burned, the combination to cheat and defraud the insurance company would be equally unlawful, and the preparation and presentation of excessive and fictitious claims would be evidence of the combination and of the criminal intent of the conspirators. We find no error in the court’s overruling the demurrer to the evidence.
 

 (3) We find no reversible error in the court’s rulings on evidence or its charge to the jury. Many of the assignments are trivial in character. For example the objection to Officer Murphy’s statement that he had been informed that the house was locked when the fire broke out. It later developed that Oshmankewicz had so told him and produced the key and gave it to the officers; and the defendants’ own witness, Franceschi, testified he had to kick in the door. The court did not err in permitting Glenn Wells’ testimony in rebuttal. Two assignments with respect to the evidence deserve some consideration.
 

 (a) The court permitted John McLaughlin, a former business associate of John Mezick, to testify that early in April, 1940, the latter had driven him out to the neighborhood of Mt. Cobb and had there shown him a property which he proposed to purchase in McLaughlin’s name for about $900 and insure it for $6,000, —placing the insurance with his brother, Dan Mezick —and then burn it down and split the insurance money three ways, one-third for each; that he had refused, and sometime in June, 1940, he had gone to William V. Murphy, a member of the State Police and a fire marshal, and told him of the proposal made to him. This, for the purpose of showing a common scheme, design or plan and motive and criminal intent on the part of the Mezicks; it being also shown that John Buchla had
 
 *420
 
 informed the officers that
 
 Daniel
 
 Mezick had driven him out to Mt. Cobb and shown him the house, but that it had not suited his purpose. At the close of the Commonwealth’s case, the court restricted this evidence to John Mezick alone and cautioned the jury to disregard it totally in passing upon the guilt of any other defendant except John Mezick.
 

 While ordinarily evidence is not admissible of a crime distinct from that for which defendants are being tried, the fact of such crime and the defendants’ connection with it may be proved whenever it tends to show guilty knowledge, design, plan, motive or intent, if these matters are in issue in the case on trial:
 
 Com. v. Bell,
 
 88 Pa. Superior Ct. 216, 223; affirmed 288 Pa. 29, 34, 135 A. 645;
 
 Com. v. Chalfa,
 
 313 Pa. 175, 178, 169 A. 564;
 
 Swan v. Com.,
 
 104 Pa. 218;
 
 Com. v.
 
 Rabin
 
 owitz,
 
 73 Pa. Superior Ct. 221, 226-7 (Porter, J.);
 
 Com. v. Flick,
 
 97 Pa. Superior Ct. 169, 174-5. Or as stated in
 
 Goersen v. Com.,
 
 99 Pa. 388, 398, “Under some circumstances, evidence of another offense by the defendant may be given. Thus it may be to establish identity; to show the act charged was
 
 intentional and wilful, not accidental; to prove motive; to show guilty knowledge and purpose, and to rebut any inference of mistake”
 
 (Italics supplied). The order of proof was in the control of the court:
 
 Com. v. Jermyn,
 
 101 Pa. Superior Ct. 455, 476;
 
 Com. v. Deutsch,
 
 72 Pa. Superior Ct. 298, 310. In view of the evidence introduced later, showing Daniel Mezick’s association with the Mt. Cobb project, the court might have permitted McLaughlin’s testimony to apply to him also, but he (Daniel Mezick) certainly was not harmed when the court restricted the evidence to John Mezick alone.
 

 (b) The other related to the cross-examination of Officer Jay Milligan, Squadron Fire Marshal of the Pennsylvania Motor Police, by Mr. Evans, one of the two attorneys representing both John Mezick and Daniel Mezick. The other two defendants had different
 
 *421
 
 counsel. After some preliminary cross-examination of Milligan, Mr. Evans said: “Now in this particular case the defense is desirous of finding out how you became interested in these four defendants.” To which the witness replied, “I had been interested in Mr. Daniel Mezick a good many years in my official capacity. If you want me to go into detail over that interest I will be glad to do so.” To which Mr. Evans replied, “I think the jury is entitled to it.” Thereupon Officer Milligan gave some instances of fires where insurance had been placed shortly before by Daniel Mezick, wihich had aroused the suspicions of the police. One of them occurred in 1937 in Jessup — the Chickarelli fire — where
 
 Daniel Mezick
 
 had employed as watchman for the building afterwards burned, a man who had served time in the Eastern State Penitentiary for arson.
 

 At this point, Mr. Murphy, the other counsel for the Mezicks said: “Wait a moment. This is objected to.” “Mr. Carrigg [District Attorney]: You asked for it.” “Mr. Evans: I opened the door. I can take it.” Whereupon, without further objection, Officer Milligan, in response to Mr. Evans’ vigorous cross-examination gave other instances that had led to the State Police’s interest in Daniel Mezick’s relations to various fires — some incendiary — on which he had placed insurance for his companies.
 

 The testimony was damaging to Daniel Mezick, but his attorney brought it out on cross-examination, in an endeavor to show the baselessness of the Police’s interest in the case.
 

 Mr. Evans had done most of the cross-examination for his clients. If, in an attempt to break down or render harmless the damaging evidence Milligan had given in chief, he embarked on a course of questioning which proved harmful to his client, neither the latter nor the associate attorney is in a position to ask for a reversal because of it.
 

 
 *422
 
 When counsel for a defendant cross-examines a witness for the Commonwealth he is acting as the representative of his client and if he elicits testimony unfavorable to his client the latter has no cause for complaint against the Commonwealth or the court. His counsel’s attention had been called to the danger he was courting, but he nevertheless persisted in his examination, and the consequences were of his own making.
 

 It was not incumbent on the Commonwealth to prove where the proofs of loss had been in the period between their delivery to the insurance companies and the trial, or to prove affirmatively that they were in the same condition as when furnished the companies, in the absence of any testimony or suggestion that they had been altered in any respect.
 

 Insufficiency of evidence is not ground for arresting judgment. We have discussed the matter, however, under the demurrer to the evidence. The jurisdiction of the court below — the only subject proper to be considered here under ‘arrest of judgment’— has already been discussed under the first heading.
 

 The case, in our opinion, was well tried by the learned President Judge. He instructed the jury fully and correctly as to the crime of conspiracy, and the evidence necessary for a conviction; and his charge as to the quantum of proof necessary to convict on circumstantial evidence alone, was in accordance with the latest pronouncements of the Supreme Court. See
 
 Com. v. Benz,
 
 318 Pa. 465, 472, 178 A. 390;
 
 Com. v. Giacobbe,
 
 341 Pa. 187, 189, 19 A. 2d 71. His instructions on ‘character evidence’ were adequate and correct, and having fully covered the subject in his charge, he was not required to reiterate his instructions by reading and affirming the defendants’ sixth point. He saw and heard the witnesses and felt that the verdict, as to all but Oshmankewiez, was justified by the evidence. His opinion refusing a new trial and arrest of judgment is a clear
 
 *423
 
 and adequate presentation of. tlie case, and justifies bis action in refusing both motions.
 

 Tbe assignments of error are overruled. Tbe judgment is affirmed and it is ordered that tbe appellant Daniel Mezick appear in tbe court below at such time as be may be there' called and that be be by that court committed until be has complied with bis sentence or any part of it that had not been performed at the time tbe appeal was made a supersedeas.
 
 ¡
 
 ;
 

 [1]
 

 See Justice Oliver Wendell Holmes, in Holmes-Pollock Letters, Yol. I, pp. 198-199.
 

 [2]
 

 He told Officer Milligan that he had walked from Dundaff to Jessup [10 to 12 miles] for the purpose of getting some food and his weekly salary, and that he had learned about the fire while in Jessup; that he walked back to Dundaff when he heard about the fire and then walked back again to Jessup. He said he wanted to ascertain if it was true that the fire had occurred.
 

 [3]
 

 We have not gone into details affecting John Mezick as a co-conspirator, because he has not appealed. Our failure to link him up in this opinion must not be understood as holding that there was not sufficient evidence of his joinder with the others in the conspiracy.